UNITED STATES of America,

v.

Marinus VAN LEUZEN and
Ronald Neal Hornbeck.

No. G–90–276.

United States District Court,
S.D. Texas,
Galveston Division.

March 31, 1993.

**1172**

Carl Strass, Environmental Defense Section, Environment & Natural Resources Div., Washington, DC, for plaintiff U.S.

Marinus Van Leuzen, pro se.

A.D. Downer, Galveston, TX, for defendant Marinus Van Leuzen.

Robert G. Coltzer, Galveston, TX, for defendant Ronald Neal Hornbeck.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

KENT, District Judge.

"Is there nothing about the United States of my youth, aside from youth itself, that I miss sorely now? There is one thing I miss so much that I can hardly stand it, which is freedom from the certain knowledge that human beings will very soon have made this moist, blue-green planet uninhabitable by human beings. There is no stopping us. We will continue to breed like rabbits. We will continue to engage in technological nincompoopery with hideous side effects unforeseen. We will make only token repairs on our cities now collapsing. We will not clean up much

of the poisonous mess that we ourselves have made.

If flying-saucer creatures or angels or whatever were to come here in a hundred years, say, and find us gone like the dinosaurs, what might be a good message for humanity to leave for them, maybe carved in great big letters on a Grand Canyon wall?

WE PROBABLY COULD HAVE SAVED OURSELVES, BUT WERE TOO DAMNED LAZY TO TRY VERY HARD.

We might well add this:

AND TOO DAMN CHEAP.

So it's curtains not just for me as I grow old. It's curtains for everyone ..." [1]

—Kurt Vonnegut

"... To the earth, a hundred years is *nothing*. A million years is *nothing*. This planet lives and breathes on a much vaster scale. We can't imagine its slow and powerful rhythms, and haven't got the humility to try. We have been residents here for the blink of an eye. If we are gone tomorrow, the earth will not miss us ...

... Let's be clear. The planet is not in jeopardy. *We* are in jeopardy. We haven't got the power to destroy the planet—or to save it. But we might have the power to save ourselves." [2]

—Michael Crichton

This case presents a classic paradox which underscores the urgency of America's environmental dilemma. For well over two hundred years, this great nation has extolled the virtues of, and has prospered upon, industrial and technological progress. At the same time, we have imbued ourselves with an environmental insensitivity that will, if left unchecked, inexorably kill all of us. As will be herein discussed in detail, this case presents a disturbing and frank contrast between what is perceived as environmentally acceptable by an appallingly large number of

1. Vonnegut, K., *Fates Worse Than Death*, The Berkley Publishing Group, New York (September, 1992), 116.

2. Crichton, M., *Jurassic Park*, Ballantine Books, New York (1990), 369.

Americans, versus what is actually and critically in the best interest of all of us.

A century ago, Defendant Marinus Van Leuzen, (hereinafter "Defendant Van Leuzen"), would have been hailed as a hardy pioneer. Ignoring his adversity, and unfettered by bothersome rules, he ventured onto the rugged Texas coast and hacked out an empire. With his own hands, he leveled and tamed the land, built a fine home and brought order and his version of beauty to the ragged wilds that preceded him. At that time, indeed this would have been the stuff of a J. Frank Dobie legend.

Unfortunately, this isn't one hundred years ago. All of the facts of this case happened right now, at a time when the fragile and constantly assaulted ecosystem that sustains *all* of us is in more peril than ever before in our national history. For the Defendant, it might ruefully be said that "timing is everything". But, today's events must be considered in current context, and by that standard, what Defendant perpetrated, in open and willful defiance of applicable law and repeated notice of violation, is no more commendable than progress' genocidal treatment of this continent's indigenous peoples, generations ago.

The lesson of this case must not be wasted upon anyone. Environmental rape threatens the very life of America, and this Court stands vigilant at the only gate to the future, for all of us.

Throughout the case, Defendant Van Leuzen seemed to find the Government's environmental concerns either frivolous or utterly incomprehensible. Indeed, he went to some pains to suggest that the Government had run amuck against a harmless, little old man; a decorated veteran and a successful area businessman and tax-payer, who sought only a quiet refuge to wile away his twilight years. A close examination of the Record, however, shows a radically different and more malignant reality. Indeed, Defendant Van Leuzen's willful and brazen disregard for the rule of law and the integrity of the environment of himself, his neighbors, and in a larger sense all of us, is a classic example of why many Americans are beginning to awaken to the stark reality that our world is literally "going to Hell in a handbasket".

## FACTUAL DISCUSSION AND TRIAL TESTIMONY

Liability was decided in the Court's Order, granting partial summary judgment, entered May 11, 1992, (Instr. # 24), and a trial was held on remedy and civil penalties, during February 22–23, 1993. A careful review of the facts of this case is critical to any understanding of its significance. Essentially, in the late Spring, 1989, Defendant Marinus Van Leuzen moved a house onto his property, on Bolivar Peninsula, about one mile east of the Bolivar Ferry (hereinafter "Site"). Previously, this land had been predominately marsh area, analogous to the property immediately to the east. Government Exhibit 13 is a photograph showing the tract in its pre-improved condition. Government Exhibit 14 shows its post-"improvement" condition. Before moving the house onto the Site, Defendant Van Leuzen performed substantial elevation work, and after moving the house onto the Site, he installed a concrete deck, concrete sidewalks, a shell drive-way, sodded grass, a substantial septic system and additional fill. This consumed roughly .415 acres (roughly 18,000 square feet) of the stated tract. The improvements completely eliminated this Site as a marsh area, and have rendered it completely urbanized.

All of this work was done without any permits whatsoever from the U.S. Army Corps of Engineers, (hereinafter "Corps of Engineers"). Defendant Van Leuzen had had prior confrontations and dealings with the Corps of Engineers, regarding permits. He knew the process, and knew what should have been done. He simply disregarded it. During the course of the operations, and well before their completion, he received Cease and Desist Orders from both the Corps of Engineers and the U.S. Environmental Protection Agency, (hereinafter "E.P.A."), as well as numerous oral and written warnings to terminate work. He ignored, or affirmatively refused, all of these and proceeded. Indeed, during trial, he expressly testified that despite receipt of any such lawful order from the Government, if it was inconvenient, he was free to simply disregard it. His attitude in this case was essentially that he owned the piece of property, could do whatever he pleased with it, and did not need

anybody's permission to put a house there, irrespective of statutory and regulatory prohibitions to the contrary, of which he had *actual* notice.

In the Court's view, Defendant Van Leuzen's concept of independence in property use is not only anachronistic, it is downright frightening. Recreational and industrial use of the Texas Gulf Coast has literally exploded over the last forty years. At least for the foreseeable future, there is room for everyone. But, indiscriminate development, in complete disregard for the environment, is intolerable. Attitudes like Defendant Van Leuzen's are beyond selfishness. Unchecked, they are the seeds of national, environmental suicide. Congress has sought a balance between the absolute needs of our ecosystem, and the right of any landowner to fairly enjoy his or her property. Safeguards are provided for all, by means of the permitting process administered by the Corps of Engineers. Complete disregard of that process benefits no-one, and will not be tolerated by this Court.

Ms. Paula Wise, a physical scientist in the Enforcement Section of the Corps of Engineers testified that she made several Site inspections. At trial, she identified a number of evidentiary items, including videos and still photographs. In April, 1989, she met with Defendant Van Leuzen regarding his manifest permitting violations. Work was underway at that time. He basically told her that he was "old and could do what he wanted to". Even in the face of his acknowledged receipt of Cease and Desist Orders, he did not stop working. Indeed, he continued fill deposits, poured concrete under the house, and placed sod around the house, over an installed septic system, *after* he had been advised to stop work. The Defendant "bragged" to several people on Bolivar Peninsula that he was "getting away with it", meaning that he was building the house in violation of applicable Corps permits.

This Court has great respect for the achievements and wisdom born of longevity. Indeed, this Court vigorously opposes age discrimination in any form. Nevertheless, any suggestion that one can age beyond the obligation to behave within the law is mean-spirited, manipulative, and completely unacceptable in any society. The law is no respecter of persons, and *all* persons, regardless of age, stand equal in a court of justice. *See* Pattern Jury Instructions, Civil Cases, 5th Cir. § 2.13, 1993.

Mr. Fred Burnside, an E.P.A. Special Agent, assigned to criminal violations of environmental laws, testified that he personally observed fill operations, at the Site, and at trial, identified numerous photographs and videos of these activities. He personally observed the permits posted at the Site and noted that while County permits were posted, *no* Corps or E.P.A. notices were posted.

Mr. Fred Anthamatten, Chief of the Enforcement Section of the Area Corps of Engineers, testified regarding Government Exhibits 21, 22 and 23, which were records of old alleged violations of Corps permit procedures by Defendant Van Leuzen. These clearly show that Defendant was knowledgeable regarding Corps permit requirements, and that he had a history of operating in violation of these permits. (However, it must be noted that with regard to two of the three prior incidents, no violations were found.)

Mr. Anthamatten confirmed that Defendant Van Leuzen brought him a Cease and Desist letter he had received and left it with him, flatly telling Mr. Anthamatten that he no intention of complying with it. Defendant Van Leuzen's actions were not the product of accident or mistake. He knew the rules and willfully and deliberately decided he had no intention of, or obligation to, follow them.

Mr. Anthamatten had three specific suggestions regarding restoration at the Site:

(1) Remove offending fill, to return the area to its pre-improved grade (sea level);

(2) Sprig the area with appropriate area vegetation; and,

(3) Follow-up sprigging and surveillance of the area as necessary, to ensure survival of sprigged materials, and a restoration of the Site to its previous marsh status.

Defendant Van Leuzen testified that he brought fill in before the house was moved onto the Site, and then substantial, additional fill after the house was moved on the Site. In total, he estimated that thirty-six truck-

loads of dirt were moved onto the property. The thirty-six loads of fill were transported to the Site by Defendant Ronald Neal Hornbeck (hereinafter "Defendant Hornbeck"), an area construction hauler. He initially testified that he had "permits" posted, but conceded during cross-examination that no Corps of Engineers' permits were posted. He claimed that he had a "permit" from his son-in-law, Mr. Ed Risemueller, but for the reasons set out in the Court's Order, entered May 11, 1992, granting partial summary judgment as to liability, such a contention is patently ridiculous. That permit had absolutely nothing to do with the stated land in question, or the use to which he was putting it. Consequently, his testimony was totally incredible, with regard to any contention that he sought or attempted to post any suitable Corps of Engineers permit. He further testified that he laid the concrete *after* the Corps of Engineers expressly told him not to. He testified that he "wanted to do it and simply did it". Also after being instructed to perform no other work, he installed a septic tank and laid 250 feet of sewer system pipeline.

Regarding mitigation assets, Defendant Van Leuzen testified that he presently has an income of roughly $3,500.00 per month, which includes a Social Security pension and monthly proceeds from the prior sale of an adjacent motel facility, on which he still holds a mortgage. He also owns additional land on Bolivar Peninsula, in his own name, and he is joint owner of several additional pieces of land, which he has allegedly deeded or assigned to his daughter and former (or estranged) wife. He estimates his present savings at roughly $10,000.00.

There was substantial equivocation from Defendant Van Leuzen as to whether he had discussed permits with Defendant Hornbeck. Initially, he told Defendant Hornbeck that he had the permits he needed. However, he seemed to imply, in his testimony, that Defendant Hornbeck knew that he did not have the required Corps of Engineers' permits. At no time did he ever tell Defendant Hornbeck he was proceeding in the face of Cease and Desist Orders. Needless to say, whether this was helpful to Defendant Hornbeck or not, such testimony was extremely damaging to the credibility of Defendant Van Leuzen.

Rather ambiguously, Ms. Wise testified that she called the home of Defendant Hornbeck, along with other area contractors, to discourage their participation in this project. However, she conceded that she only talked to his young son, who was then approximately fourteen years of age, and only left a message. She did not follow this up in writing, and never talked to Defendant Hornbeck personally. Consequently, there is a real question as to whether he had actual notice of the nature of Defendant Van Leuzen's violations, at the time that he was participating in fill deliveries, at the Site.

Defendant Hornbeck testified, in his own behalf, and appeared to the Court to be a forthright, direct and responsible witness. He expressly asked Defendant Van Leuzen if he had all the permits necessary for him to do fill work on the property. Defendant Van Leuzen repeatedly assured him he had "all the permits he needed", and "don't worry about it". On the other hand, Defendant Hornbeck had had two prior experiences with the Corps of Engineers, regarding permitting problems of his own, and he knew full well, from having lived on Bolivar Peninsula for many years, what the permit requirements were. (Ironically, these problems arose from complaints made by *Mr. Van Leuzen*). He was cavalier and irresponsible in the manner in which he made inquiry about the applicable permit in this case, never asking to actually see it, and never pressing the matter beyond a few vague conversations. Consequently, it is the Court's perception that he was deficient in his exercise of reasonable care in determining the propriety of the permit covering this actual project, and that his profits of $1,800.00, or $50.00 per each of 36 loads, was received improperly.

In the totality of the circumstances of this case, and understanding that he was an independent contractor, with no control over the fiercely independent (and deceitful) Defendant Van Leuzen, the Court feels that the appropriate remedy for Defendant Hornbeck is forfeiture of one-half of his profits, or a penalty of $900.00. The Court feels that Defendant Hornbeck should not be required to participate in any way in the restoration of

Defendant Van Leuzen's property, and he will not be herein required to do so.

Defendant Hornbeck further testified that he is out of the trucking business, and his truck is presently uncertified and unlicensed. He has had severe financial reverses over the last couple of years and is presently almost destitute. The Court believes this testimony. Consequently, such fine shall be prorated at the rate of $50.00 per month, until paid. However, the Court shall retain plenary jurisdiction over this matter, to enforce the timely and complete payment of such fine with contempt citation, as appropriate.

Mr. Donald Moore testified as a Rule 702 witness, for the Government, in the field of marine ecology. He works with the National Marine Fisheries Service, which is a part of the Department of Commerce. His curriculum vitae is a part of the Pre–Trial Order.

Referring to Government Exhibit 13, Mr. Moore testified that Defendant Van Leuzen's tract is a "fringe marsh in a tidal cove, in a tidal pass". This is very important for both fin fish and small crustacean development. There is a massive tidal flow along this property, emanating both into and out of Galveston Bay, to and from the Gulf of Mexico, and this recessive cove, in the shore-line, is extremely important to larval aquatic development. He considered Defendant Van Leuzen's property very unique, for this general area. Marsh is very important for nourishment and protection, regarding young shellfish, particularly shrimp and crabs, and young fin fish. Marshes can be very small and still be valuable. Restoration of marshes can be effective, but there is a substantial lag time between actual restoration and resumption of use by applicable wildlife.

Of significance, he testified that between the 1950's and about 1989, when the last major study was undertaken, there has been a disappearance of roughly one-fifth of all of the wetlands, in the Galveston Bay area. Therefore, loss of *any* marsh area is significant to the area environment. His suggestions regarding restoration of the property were analogous to other witnesses, including essentially removal of all fill dirt and resprigging of viable vegetation. He also suggested "finger canals", but the Court finds these excessive and beyond the scope of what is required to return the area to its pre-development condition.

Mr. Philip Glass also testified as a Rule 702 witness, regarding ecology of marshes. He is an employee of the U.S. Fish and Wildlife Service. His curriculum vitae is also a part of the Pre–Trial Order. Mr. Glass testified that various habitats on land are important to both bird and fish ecosystems. He noted that the relevant property of Defendant Van Leuzen served multiple purposes as bird habitat, fish habitat, and a suitable host for a variety of plant species. He considered this property critically important in the area ecosystem and felt that its loss was significantly detrimental to the whole area of its location.

Mr. Norm Sears was also called as a Rule 702 witness, in the field of wetland restoration. He is an E.P.A. life scientist. His curriculum vitae is also a part of the Pre–Trial Order. He testified, essentially, that marshes are extremely beneficial with regard to both pollution absorption and prevention of erosion on the coastline. He felt that Defendant Van Leuzen's property was unique, in both respects, and that it was a significant loss to the area, in its present condition. He also encouraged restoration to original elevation and resprigging with suitable vegetation.

Appearing at trial as a witness in behalf of Defendant Van Leuzen was Galveston County Commissioner Eddie Barr. Commissioner Barr testified that Defendant Van Leuzen's property is in an extremely high erosion area. Indeed, he and others had previously sought permits to dump significant dredge spoils in this area, to protect Texas State Highway 87, which runs adjacent to Defendant Van Leuzen's property. However, this permit application bogged down for a variety of reasons, not the least of which were significant environmental concerns, and the permit was never granted. Moreover, he conceded that even if the fill had been made, having some effect on the wetland, he was not sure how this would actually effect Defendant Van Leuzen's property. He readily conceded that an order to stop work from the Corps of Engineers should be immediately honored, and that work in violation of permits from

the County is frequently corrected, including a requirement that the work be redone, or in fact removed. Considering that he was brought as a witness on behalf of Defendant Van Leuzen, his testimony was devastating to that Defendant's credibility and contentions.

Dr. James Parker, an area medical doctor, was presented as a Rule 702 witness in zoology and environmental studies. He has been a frequent environmental activist in the area, and a foe of Corps of Engineers and various industries' projects for a number of years. Frankly, a great deal of his testimony with regard to location of ponds, and other things, seemed irrelevant to the instant cause. However, of note, he has seen Defendant's property and is familiar with area flora and fauna. He conceded the presence a marsh area immediately to the east of Defendant Van Leuzen's property, and further conceded that Defendant's property was also a marsh, *before* he filled it in. While filling in a marsh area will cause damage, he contended that the area would likely be lost at some time in the future, in any event, to save the Highway. He felt that either erosion would take the property away completely, or that it would have to be filled in with "rip-rap" to protect the Highway. However, when pressed in this regard, he could not give a time table, or any specifics. Moreover, he readily conceded some personal shock that permitting requirements were completely ignored, and he agreed that the law should be scrupulously followed in environmental matters.

The Court asked for his specific suggestions for mediation of the property, to which he responded that "a couple of ponds could be built". However, when pressed, he conceded that these were intended for bird use, and that bird use would be discouraged even with ponds, where a house is in the middle of the pond area. While professing no expertise regarding marine life, he further conceded that the "perfect solution" would be restoration of the area to marsh land, as marshes "constitute significant deterrents to both pollution and erosion".

Defendant's final Rule 702 witness, Mr. Charles Bellaire, testified regarding wetlands as an environmental consultant, specializing in permitting processes. Rather extraordinarily, he also conceded that the best mechanism for resolving the abuse to this land site would be return of the land to its pre-fill grade, with the sprigging of various grass species in the re-graded area. He stated that ponds were possible, but that their use would be limited, and if there was any level of activity around the house, it would discourage bird populations.

The reason for his call to trial was to essentially suggest that the Corps of Engineers should find an alternative site, to build a marsh on, at a reasonable price. The Court feels this testimony was ridiculous, and not enthusiastically presented. In response to hypothetical questioning, he readily conceded that if he owned a piece of ranch land, and someone came along and built a factory on an adjacent piece of ranch land, with resulting noxious fumes, noises, smoke, etc., but offered to build a renewed piece of ranch land someplace down the highway, this would be a completely unacceptable alternative, and that he would want the adjacent land properly used. He also conceded that permitting is extremely important, and that no one should violate Cease and Desist Orders *or benefit from the violation of those Orders*. Again, although this was a defense witness, his testimony was devastating to Defendant Van Leuzen's contentions.

Against this factual backdrop, the Court will now make relevant Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FINDINGS OF FACT

1. This is a suit by the United States to compel the restoration of the wetland portion of the Site at issue, and for civil penalties. The Court has set out a statement of the case in its Order, entered May 11, 1992, granting the United States' motion for partial summary judgment on the issue of whether the filled area on the Site is a wetland.

2. The Site is located approximately 1 mile east of the Bolivar Peninsula Ferry Landing, near the tip of the Bolivar Peninsu-

la, in Galveston County, Texas. The Site is bordered on the North by Texas State Highway 87, on the East by FM 2612, on the South and West by the channel entrance to Galveston Bay, and on the Southeast by Colonel's Lady Bait Camp.

3. The filled area of the Site was found to contain wetland by the Court in its Order, entered May 11, 1992. The wetland area of the Site is described by the map which was attached to the affidavit of Ms. Paula Wise in support of the Government's motion for partial summary judgment (Government Exhibit 18). The wetland area can be identified by reference to the map itself, the surveyor's notes made during the mapping, a survey of the entire holdings of Defendant Van Leuzen (Van Leuzen Exhibit 3), and a video tape made of the Government's survey. (Government Exhibit 1).

4. The Site is owned or occupied by Defendant Marinus Van Leuzen.

5. A portion of the fill placed on the wetland on the Site was delivered by Defendant Hornbeck.

6. In April of 1989, a Corps of Engineer employee, Ms. Wise, advised Defendant Van Leuzen, both through his employees, and in person, that the fill work at the Site constituted illegal filling of a wetland and must cease.

7. A short time prior to this, Defendant Van Leuzen had hired Defendant Hornbeck to deliver approximately 20 truck loads of fill to the wetland area, over the course of several days.

8. Defendant Van Leuzen had become familiar with the permit requirements of the 1899 Rivers and Harbors Act and the Clean Water Act in the 1970's, having been involved in several prior disputes with the Corps of Engineers over work done without a permit. (Government Exhibits 20–23).

9. Defendant Van Leuzen declined to stop his filling activities after being so instructed by Ms. Wise in April of 1989, and a formal Cease and Desist Order was sent to him by the Corps on May 8, 1989. (Government Exhibit 19).

10. Shortly thereafter, Defendant Van Leuzen returned the Cease and Desist letter to the Corps and said that he would not obey it.

11. Defendant Van Leuzen continued to fill after he received the Corps' Cease and Desist Order.

12. The case was referred to the United States Environmental Protection Agency (E.P.A.), which sent out a Formal Administrative Order to Defendant Van Leuzen on July 4, 1989, which he received a few days later. (Government Exhibits 20 and 30).

13. Defendant Van Leuzen continued to fill after receipt of E.P.A.'s order. (Government Exhibits 2, 5 and 30).

14. Defendant Van Leuzen continued to fill the wetland, not only after he had been instructed not to by the Corps of Engineers, but after contractors in the area had been alerted by the Corps that said Defendant had no permit, with the result that contractors (except Defendant Hornbeck) were refusing to deliver materials to the Site.

15. After area contractors refused to deliver to him, and after he had received E.P.A.'s order not to fill the wetland, Defendant Van Leuzen had Defendant Hornbeck deliver 16 additional loads of fill to the wetland, over the course of several days. Defendant Van Leuzen later spread each load, without the assistance of Defendant Hornbeck. (Government Exhibit 2).

16. Sometime after being told not to fill by the Corps, Defendant Van Leuzen spent several days installing a concrete pad in the wetland.

17. Sometime after being told not to fill by the Corps, Defendant Van Leuzen spent several days installing a septic system in the wetland.

18. Sometime after being told not to fill by the Corps, Defendant Van Leuzen spent several days installing sod in the wetland.

19. Defendant Van Leuzen's actions were extremely willful, and with utter contempt for the law. Said Defendant has no equities in his favor in this case.

20. Defendant Hornbeck was aware of the federal wetlands permit program having been the subject of complaints (by Van Leuzen) against allegedly unpermitted work prior

to the filling in this case. (Government Exhibit 25).

21. There was no federal permit on display at the Site at the time Defendant Hornbeck delivered fill to the Site, although oral representations were made that Defendant Van Leuzen had "all the necessary permits".

22. After Defendant Van Leuzen continued to fill in the face of the Corps' instructions to the contrary, Ms. Wise called Defendant Hornbeck's home and left an ambiguous message with his underage son that Defendant Hornbeck was not to deliver fill to Defendant Van Leuzen. Defendant Hornbeck probably received this message, but testified credibly that he did not fully understand it.

23. Defendant Hornbeck was aware that persons were observing and photographing his filling activities, but continued with them. (Government Exhibit 2). Defendant Van Leuzen never informed him that a Cease and Desist Order had been issued.

24. Bolivar Peninsula is a small community, and it is unlikely that Defendant Hornbeck did not hear that contractors would not deliver material for fill to Defendant Van Leuzen because he did not have a permit; nevertheless, he was entitled to rely, to some extent, upon the initial representations of Defendant Van Leuzen.

25. The violation in this case was extremely open and notorious. The Site is on the main route from Bolivar to the ferry to Galveston. The Corps of Engineers, E.P.A. and the United States Fish and Wildlife Service have all received telephone calls inquiring about this case. The open, notorious, and willful violations at the Site have damaged the federal wetlands permit program in the area.

26. Defendant Hornbeck received $1,800.00 from Defendant Van Leuzen for his delivery of fill to the wetland, at the rate of $50.00, per each of 36 loads delivered to the property.

27. The wetland filled is ecologically of great value, being located on the tidal pass (a narrow waterway, subject to the ebb and flow of the tide) between the Gulf of Mexico and Galveston Bay. (Government Exhibits 16 and 17).

28. The Defendants filled about 18,000 square feet (0.415 of an acre) of wetland of a kind which is scarce in the Galveston–Bolivar area.

29. The wetland filled is of a unique quality, and serves many ecological uses, in all seasons, including habitat and food sources for many small crustacea and fish, as well as birds. The area supports a food chain upon which commercial and sport fishermen, crabbers, and shrimpers rely.

30. The injury caused by the filling of this wetland will not be completely undone by the restoration of that wetland. There will still be a substantial time interval before the restored wetland can function at its prior value. Additionally, the time during which the wetland is filled is completely lost to the environment.

31. It is feasible to restore the original contours and vegetation of the wetlands which are on the Site. It would be an environmental benefit to do so.

## II. CONCLUSIONS OF LAW

1. This Court's jurisdiction rests upon Section 12 of the 1899 Rivers and Harbors Act, 33 U.S.C. § 406, and sections 301(a), 309(b) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1319(b), 1344, and 28 U.S.C. §§ 1331, 1345, 1355.

2. Venue in this District is proper, pursuant to 28 U.S.C. §§ 124(b), 1391(b), 1395(a).

3. The filling of the wetland on the Site violated Sections 301(a) and 404 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1344.

4. Section 309(d) of the Clean Water Act authorizes civil penalties of up to $25,000.00 per day, per violation. 33 U.S.C. § 1319(d). Accordingly, Defendant Van Leuzen is theoretically subject to in the neighborhood of $1,000,000.00 million in fines, and Defendant Hornbeck at least $100,000.00 in fines.

5. Section 309(d) requires that the Court impose some fine upon each Defendant. *Atlantic States Legal Foundation, Inc. v. Tyson Foods,* 897 F.2d 1128, 1142 (11th Cir. 1990); *Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208–1209 (4th Cir.1986).

■ 6. Environmental statutes are to be given broad and generous interpretations to effect their purposes. *Wyandotte Co. v. United States,* 389 U.S. 191, 199–201, 204–205, 88 S.Ct. 379, 384–386, 387–388, 19 L.Ed.2d 407 (1967); *United States v. Republic Steel Corp.,* 362 U.S. 482, 491, 80 S.Ct. 884, 889, 4 L.Ed.2d 903 (1960). This Court has already held, in its Order, entered March 11, 1992, that the Defendants are liable for the violation in this case, even without the evidence of willfulness which is present, as regards Defendant Van Leuzen.

7. The duty to restore an intentionally filled wetland is mandatory, absent equities. Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b); *United States v. Cumberland Farms,* 826 F.2d 1151, 1161–65 (1st Cir.1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988); *United States v. Robinson,* 570 F.Supp. 1157, 1164–65 (M.D.Fla.1983); *United States v. Bradshaw,* 541 F.Supp. 884, 885–86 (D.Md.1982); *United States v. Board of Trustees of Florida Keys Comm. College,* 531 F.Supp. 267, 275–76 (S.D.Fla.1981); *United States v. Weisman,* 489 F.Supp. 1331, 1347–50 (M.D.Fla.1980).

■ 8. Defendant Van Leuzen lacks any equities in this case. He must restore the wetland he filled, remediate the damage caused by lost use, and take steps to undo the damage he has inflicted upon the wetlands permit program by his open and notorious actions.

■ 9. Defendant Hornbeck has some equities in this case and consequently will have no duty of removal of fill from the Site.

10. In the event that any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such. In the event any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

In light of the foregoing Findings of Fact and Conclusions of Law, the Court herewith enters the following Final Order. The essence of such will be that in the short term, Defendant Hornbeck will pay the stated civil penalty, and Defendant Van Leuzen will undertake critical remedial actions to reclaim as much of the adulterated wetland as quickly as possible. In the long term, Defendant Van Leuzen will pay the stated civil penalty, in combination with total remediation, that will ultimately require relocation of the house, concrete pad, septic system, shell driveway and sodded grass, and restoration of the wetland under the house. As regards the latter, Defendant Van Leuzen, should he desire it, will be granted a *de facto* life estate, to accommodate his advancing years. At his option, and to make available to him an economic incentive, an accelerated option for total remediation is provided. In either event, total and permanent restoration of the wetland to its pre-adulterated state will be accomplished. To the casual observer, such remediation might seem Draconian. However, the Court has carefully considered the exceptional bad faith manifested by Defendant Van Leuzen's total disregard for the Corps' permitting process, and the harm done to both the area environment and the Corps' permitting program, and has gone to considerable effort to fashion both a civil penalty and a remedy uniquely suited to the resolution of this sad and wholly unnecessary insult to Galveston Bay's ecosystem.

While acknowledging Defendant Van Leuzen's *utter* lack of equities in this case, the Court has nevertheless tried to fashion a humanitarian remedy that will provide him with secure shelter in his final years, while at the same time prohibiting his profit from or enhancement by violation of both the rule of law and the environmental best interests of all of us. Near the Site stands a magnificent iron lighthouse that has served as a beacon to all in peril at sea for over 125 years. The Court hopes the extraordinary remedy herein set out will serve as an equal beacon, clearly signalling to every person within this District and Division, that each of us must live in respectful harmony with the gracious estuarial ecosystem that sustains *all* of us, and that *no-one* is above the laws enacted to ensure that lofty and critical goal.

## FINAL ORDER

### 1. LIABILITY

The Defendants' violations of the Clean Water Act are set out, in part, in the Court's Order, entered May 11, 1992. Additional violations were demonstrated at the trial on

remedy and civil penalties held on February 22–23, 1993. It is sufficient to note that there were more than 20 specific violations, involving filling without a permit. Defendant Van Leuzen also ignored two specific orders, one from the Corps of Engineers and one from E.P.A., to cease filling. Defendant Van Leuzen is liable for removal of the fill which he had unlawfully placed in the wetland without a permit, and for restoration of the environmental damage which was consequently created, including damage to the wetlands protection program of the United States, E.P.A. and the Corps of Engineers. Defendant Van Leuzen is liable for removal of all of the fill placed upon the Site, restoration of the entire Site (including restoration of environmental injury resulting from the violations), and damage to the wetlands protection program. Defendants are both liable for civil penalties for the violations of law which they have committed, as herein provided.

## 2. REMEDY

Defendant Van Leuzen is to remove the illegal fill placed or caused to be placed on the Site. He shall also restore the area, repair the environmental injury, and remediate the damage to the wetlands program. Sections 4 and 5 of this Order set out a plan for that work, but that plan is only a method of remedy to be attempted. That plan is not a substitute for, or a release of, the obligation of Defendant Van Leuzen to remove the fill and to restore the Site, which obligation will continue until accomplished and run with the land as a covenant or servitude, binding upon Defendant Van Leuzen and all successors or assigns to interest in the land.

## 3. CIVIL PENALTY

■ Defendant Hornbeck will pay a civil penalty of $900.00, which is one-half of the gross income which Defendant Hornbeck has represented to the Court as his earnings for his filling actions. Such shall be due and payable immediately. But, at said Defendant's option, such amount may be paid at the rate of $50.00 per month, for a period of 18 months, commencing on May 5, 1993, with each payment due thereafter on the 5th of each succeeding month. In no event shall any payment be made after the 10th of the month due. FAILURE TO TIMELY PAY ANY PAYMENT SHALL PLACE DEFENDANT IN "DEFAULT" IN WHICH EVENT THE REMAINDER OF THE FULL AMOUNT LEFT UNPAID SHALL BE DUE AND PAYABLE IMMEDIATELY. IN THAT EVENT, SAID DEFENDANT SHALL BE IN CIVIL CONTEMPT OF THIS COURT, AND SHALL BE INCARCERATED UNTIL THE FULL, RESIDUAL AMOUNT IS PAID, THEREBY PURGING SAID DEFENDANT OF SUCH CONTEMPT. Payment in full of the remaining amount due, at any time during the 18 month payment period, shall be without penalty, and shall release said Defendant of any further obligation, pursuant to this Order.

Defendant Van Leuzen will create a fund for Site restoration and payment of a civil penalty, as detailed in Section 5 below. The funds not used for restoration will go into the Treasury of the United States as a civil penalty.

## 4. IMMEDIATE ACTIONS

### A. *Work to be Done*

Defendant Van Leuzen will immediately prepare a plan of work to restore all of the filled wetlands on the Site, except for those under the house, the concrete pad under the house, the shell driveway, and the existing grass fringe around the house and concrete pad. To the extent that there must be a transition from the grass fringe to the restored wetland, the width of the grass fringe shall be the minimum width necessary to allow stability for the house pilings, but in no event more than 12 feet from the side of the house, measured in the perpendicular. The transitional slope from the concrete slab to the restored wetlands shall be of a suitable gradient so as to provide stability for the slope, while maximizing the area of the restored wetland. Defendant Van Leuzen will provide a copy of his plan of work to the Corps of Engineers for its concurrence at least seven working days before commencing work. Work must commence within 30 days of the entry of this Order. FAILURE TO TIMELY SUBMIT A PLAN OR TO COMMENCE WORK SHALL CONSTITUTE AN ACT OF CIVIL CONTEMPT. DE-

FENDANT SHALL THEN BE SUBJECT TO INCARCERATION UNTIL SUCH OBLIGATIONS HAVE BEEN FULFILLED.

The work shall include, at a minimum, removal of the fill, restoration of the original land contour, resprigging of the restored contour with the previously existing vegetation (the sprigs to be planted no further apart than upon three foot centers), and the installation of a culvert under the driveway, so that the restored wetland can regain its wetland hydrology. This area of initial restoration is marked upon attached Exhibit "A" *, in the area marked in yellow by the Court. This initial portion of the restoration of wetlands is to be completed within seven months of the entry of this Order. FAILURE TO DO SO WILL CONSTITUTE AN ACT OF CONTEMPT.

Defendant Van Leuzen shall, within 10 days of entry of this Order, disconnect his septic system in the wetlands, remove the tanks, and use other, lawful means to dispose of waste from his house, in conformity with Galveston County sanitation ordinances and/or codes. It is expected that this purpose will be accomplished by the use of a nearby holding tank found on an adjacent former bait camp. Flow equipment will be installed if necessary for proper operation. Nothing in any part of this Order shall excuse Defendant Van Leuzen from compliance with all federal, state, and local environmental and sanitation laws. FAILURE TO MAKE NECESSARY SEWAGE ALTERATIONS SHALL CONSTITUTE AN ACT OF CONTEMPT.

In addition, by the time of commencement of restoration work, Defendant Van Leuzen shall have erected at his own cost, a ten foot by twenty foot billboard, six feet off the ground, on the Site facing Highway 87, or utilize an existing billboard across the street from the Site, facing Highway 87, and post the attached message (Exhibit "B" to this Order) to alert passersby that illegal fill, placed without a permit, is being removed from the Site by the filler, at his own expense, that the filler is also paying a fine, and that the filler is also committed to continue Site restoration when he has additional funding. The billboard shall remain clearly visi-

ble to passersby until the work Ordered in this Section of the Order is complete, and for 30 days thereafter. FAILURE TO DO SO WILL CONSTITUTE AN ACT OF CONTEMPT.

Defendant Van Leuzen shall notify the Corps of Engineers of the completion of each step in this Order (disconnection and removal of the septic system; connection to the holding tank; first stage removal of the fill and restoration of the original contour; resprigging of the original vegetation; installation of the culvert; regrading of the grass fringe; completion of the billboard), by telephone call to the office of Corps counsel in the Galveston District and by the sending of a confirming letter. The Corps shall then be given a reasonable opportunity to inspect the work.

Defendant Van Leuzen, or any succeeding landowner, shall maintain the restored wetland, resprigging as necessary wherever the new vegetation may have died, and keep the culvert clear.

### B. *Restrictions Upon Activities*

■ Defendant Van Leuzen, or any succeeding landowner, shall create no new improvements of any kind, whether structures, pads or drives, or anything else, anywhere upon the Site presently owned or occupied by Defendant until after complete restoration of the entire wetland area which was filled, including the area under the house. If the improvements currently in place are destroyed by accident, act of God, force majeure, or other action, they may not be reconstructed on the Site until after complete restoration of the entire wetland area, including the area presently occupied by the house. In no event may Defendant Van Leuzen, or any succeeding landowner, construct anything new in the wetland area at any time, even after complete wetland restoration. The obligation to maintain the wetland area as a wetland shall run as a covenant or servitude with and upon the entire parcel presently owned or occupied by Defendant Van Leuzen, subject only to a radical transformation of reasonable land use, based upon act of God, or events wholly beyond control of the landowner, such as storm erosion, seismic disrup-

---

* Not provided for purposes of publication.

tion, volcanic activity or the like. His temporary use of the wetland area in a filled condition, pursuant to this Order shall be at most a life estate, solely to accommodate him with a domicile, during his advancing years, and the wetland shall be restored upon his death by his estate, or by any successors or assigns accepting an interest in the Site. Defendant Van Leuzen shall not sell or encumber any of his assets until after the wetland area is fully restored, including the area under the house, except as might be required to finance any or all of said Defendant's obligations hereunder.

Neither Defendant Van Leuzen nor Defendant Hornbeck shall, at any future time, or at any site, violate the Clean Water Act, the 1899 Rivers and Harbors Act, or any of the regulations implementing those Acts.

### C. *Implementation*

Defendant Van Leuzen shall, within 30 days of the entry of this Order, file a certified copy of this Order in the land records for Galveston County or, at the election of the Clerk, a notice of the entry of this Order, so as to provide permanent public notice of the effect of this Order upon the use of the lands affected. In the event that the Clerk of the records is unwilling to file the necessary document, it shall be Defendant Van Leuzen's obligation to point out to the Clerk the decision in *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), which allows the United States to create estates in land not known at state law. Defendant Van Leuzen shall provide the Corps of Engineers and the Department of Justice with a stamped copy of the document entered, or notice that entry has been refused, giving the reason for refusal. The Government, in that event, shall be free to move the Court for an Order compelling the Galveston County Clerk's acceptance for filing of an appropriate notice of encumbrance.

Defendant Van Leuzen shall also provide a copy of this Order to the present owners of the Fisherman's Cove Motel (the person or persons who are obligated to make mortgage payments to Defendant Van Leuzen for the purchase of the motel across the street from the Site), and to the United States National Bank of Galveston. FAILURE OF ANY PERSON OR ENTITY TO TAKE ANY STEPS REASONABLY REQUIRED TO EFFECTUATE THE SPIRIT AND INTENT OF THIS ORDER SHALL CONSTITUTE AN ACT OF CONTEMPT.

All written notices to the Corps of Engineers required by this Order shall be sent to the Office of Counsel, United States Army Corps of Engineers, at the local district, which is presently located at P.O. Box 1229, Galveston, Texas 77553–1229. All written notices to the Department of Justice required by this Order shall be sent to the Chief of the Environmental Defense Section, United States Department of Justice, 10th and Constitution Avenue, N.W., Washington, D.C. 20044.

### 5. COMPLETE RESTORATION

#### A. *Accumulation of Funds*

■ As part of his obligation to restore the filled wetland, and not as a substitute for that obligation, and also in order to pay a civil penalty as mandated by law, Defendant Van Leuzen shall accumulate and invest the sum of $350.00 per month for a period of not less than eight, nor more than twelve years, from the date of entry of this Order. This shall be done by Defendant Van Leuzen's opening of a trust account at the United States National Bank in Galveston, Texas, and the depositing on a monthly basis into that account the amount of $350.00. The account shall be opened within 30 days of the entry of this Order. Notice of the opening of the account, a copy of the instructions given to the mortgagor, a copy of the instructions given to the Trustee, and the name and address of the Trustee who is to receive the payments shall be provided to the Corps of Engineers, the Justice Department, and the Fisherman's Cove Motel by Defendant Van Leuzen. The Fisherman's Cove Motel shall be instructed, in writing, by Defendant Van Leuzen, to send the monthly mortgage payment directly to the Trustee. The Trustee shall be instructed, in writing, by Defendant Van Leuzen, as follows: the Trustee is to receive the monthly mortgage payment from the Fisherman's Cove Motel, deduct the $350.00 due, and send the remainder to Defendant Van Leuzen; the Trustee is to send a copy of the periodic account statements to the Corps of Engineers; in the event that

the mortgage is paid in a lump sum for any reason, the Trustee shall receive the entire sum for investment; in the event of the death of Defendant Van Leuzen, the Trustee shall retain and invest all monthly payments therefore received, and thereafter received from said Defendant's estate, until this Court shall determine the appropriate disposition of the accumulated funds (plus any interest or earnings thereon).

In the event that the wetlands, including the area under the house, are completely restored in eight years or less, such to be solely at said Defendant's cost, Defendant Van Leuzen's (or his estate's) obligation to make payments shall cease at the end of eight years, from the date of entry of this Order.

### B. *Plan of Work*

Within three years of the entry of this Order, Defendant Van Leuzen and the United States (through the Corps of Engineers) shall present to the Court a plan for completing the restoration of the filled wetlands on the Site, including the area under the house. In the event that the parties do not reach agreement, each shall submit a plan to the Court, which shall decide upon a plan of work. If complete restoration of the wetlands has not been accomplished by Defendant Van Leuzen within eight years of the entry of this Order, then the Court will appoint a trustee and/or receiver for the entire parcel now owned or occupied by Defendant Van Leuzen. The parties shall be given a reasonable opportunity to suggest up to three persons to serve as the trustee or receiver for the parcel, and to object to the candidate selected. However, final selection shall be at the discretion of the Court. The

trustee and/or receiver for the parcel shall use the accumulated trust fund to accomplish the restoration of the wetland, according to the adopted plan. Defendant Van Leuzen, or his successors, or assigns, shall not interfere with the restoration. In removing the house from the wetland area, the trustee and/or receiver for the parcel shall have no obligation to relocate or protect the house beyond placing it upon the ground, outside of the wetland. The trustee and/or receiver for the parcel may sell or otherwise dispose of any other material removed from the wetland as part of the work. Any funds realized from such sale shall be applied to wetland restoration costs. Any funds remaining in the trust fund after restoration of the wetland shall be deposited immediately into the Treasury of the United States, as a civil penalty. The trustee for the account shall send the check, made out to the Treasurer of the United States, to the Department of Justice, at the above address, with a cover letter referencing this case, and stating that the check represents a civil penalty for violation of sections 301 and 404 of the Clean Water Act. FAILURE OF DEFENDANT VAN LEUZEN TO TIMELY COMPLY WITH ANY PROVISION OF THIS SECTION SHALL CONSTITUTE AN ACT OF CONTEMPT.

### 6. RETAINED JURISDICTION

The Court retains jurisdiction to implement and enforce this Order, and any subsections hereof, and to take all actions or enter all necessary Orders to insure that complete restoration of the wetlands is accomplished and civil penalties paid, in strict conformity herewith.

IT IS SO ORDERED.

EXHIBIT B

# WETLANDS RESTORATION

Illegal fill material, deposited without required permit from the U.S. Army Corps of Engineers by Mr. Marinus Van Leuzen is being removed by the filler at his own expense. In addition, the wetlands shall be revegetated and civil penalties paid. Final restoration of the property, including relocation of the house, shall be funded by Mr. Van Leuzen when he has additional funding.

AS ORDERED BY THE U. S. DISTRICT COURT for the Southern District of Texas, Galveston Division, on behalf of the U. S. Army Corps of Engineers and the U. S. Environmental Protection Agency.